**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL ROBINSON,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **CORIZON HEALTH INC., *et al.*,** | : | **No. 17-3868** |
| **Defendants.** | : | |

<u>**MEMORANDUM**</u>

**Schiller, J.**                                                                                   **February 5, 2019**

When Michael Robinson was arrested in August 2015, it had been over four years since he had undergone a successful kidney transplant. But after just three months in the Curran Fromhold Correctional Facility ("CFCF"), he was undergoing another kidney operation—this time, to remove his transplanted kidney due to acute kidney failure and transplant rejection. The parties offer differing reasons for Robinson's rapid decline in health: Robinson points to the defendant medical providers' failure to prescribe his full regimen of anti-rejection medications; the defendants claim that Robinson did not comply with the kidney medications he received while at CFCF.

Robinson has asserted five different claims, including constitutional claims for inadequate medical care and negligence, against the private company providing healthcare services at CFCF, Corizon Health Inc., and seven medical providers employed by Corizon. Those medical providers have all moved for summary judgment. For the reasons that follow, the Court denies Dr. Robin Clemons' motion for partial summary judgment; grants Dr. Bruce Blatt's motion for partial summary judgment; grants Dr. Michelle DiLauro's motion for summary judgment; and grants in part and denies in part the motion for summary judgment brought collectively by Roseann Green, N.P., Charlotte Hamilton, N.P., Constance Orji, P.A., and Karen McKinney, P.A.

# I. BACKGROUND

## A. Facts

On August 28, 2015, Michael Robinson was arrested and, on the following morning, arrived at CFCF. (Blatt's Statement of Undisputed Facts in Supp. of Mot. for Partial Summ. J. [Blatt SUF] ¶¶ 20, 23.) At the time of his arrest, he was prescribed three medications—Prednisone, CellCept, and Prograf—to prevent the rejection of his transplanted kidney, which he had received in April 2011. (*Id.* ¶¶ 14, 16.) The parties all agree that the Corizon providers had prescribed Robinson only two of these medications by the time his kidney transplant doctors, who are not parties to this lawsuit and do not have any affiliation with Corizon, discovered that he was in acute kidney failure on November 18, 2015. (*Id.* ¶¶ 29, 42, 66.) Which medical providers had a responsibility for Robinson's transplant care; when those providers learned that Robinson had not been prescribed his full anti-rejection regimen; and what actions they took—or failed to take—after learning that he was going without his medications are all issues relevant to the motions presently before the Court.

### i. Medical Intake

When Robinson was arrested on August 28, he told the police that he took daily medications, including ones for his transplanted kidney. (*Id.* ¶ 20.) Because he had not taken his medications before the arrest, the officers took him to the emergency room at Hahnemann University Hospital, where he told the medical staff that he was prescribed CellCept and Prograf. (*Id.* ¶¶ 20-22.) The staff gave him a prescription for the two drugs as well as discharge paperwork identifying the prescriptions. (*Id.* ¶ 22.) Although the parties disagree about what happened to these discharge papers or whether any Corizon medical staff saw or even knew about them, it is

undisputed that a copy of them was placed into Robinson's correctional records but not into his medical chart. (Pl.'s Statement of Add'l Facts in Resp. to Blatt ¶ 100.)

On the morning of August 29, after leaving Hahnemann Hospital, Robinson arrived at CFCF, and a registered nurse performed a medical intake examination. (Blatt SUF ¶ 24.) Medical records from the intake exam indicate that Robinson was a kidney transplant recipient and that he took Prednisone and CellCept. (*Id.*) However, the records make no mention of Prograf, (*id.*), and the parties dispute whether Robinson told the registered nurse about this third medication. (Pl.'s Resp. to Blatt SUF ¶¶ 23-25.)

Regardless, there is no dispute that, during the intake exam, Robinson completed a "Release of Information" form to obtain his medical records, including a list of his medications, from Albert Einstein Medical Center, where he received ongoing care for his kidney transplant. (Blatt SUF ¶ 25.) Dr. Eke Kalu, the Regional Medical Director for Corizon, testified in his deposition that such releases are regularly used when the medical staff "determine[s] additional information is necessary to guide [the patient's] care." (Pl.'s App. in Opp'n to Mot. for Summ. J. [Pl.'s App.], Ex. 8, Eke Kalu Dep., at 38.) The medical intake form noted that the release form had been completed. (Blatt's App. in Supp. of Mot. for Partial Summ. J. [Blatt's App.], Ex. 12, 8/29/15 Record of Lot Aing, RN.) However, the medical note failed to mention that, on the patient name line of the release, Robinson wrote "Michael D Robinson," but he signed the form as "Michael Daniels," the name that he was known by in the corrections system. (*Id.*, Ex. 15, 8/29/15 Release of Information.) Nowhere in Robinson's medical records at CFCF did a medical provider note that outside medical providers knew him by a different name.

That same day, Defendant Nurse Practitioner Roseann Green saw Robinson for a physical exam, in part because he had a pre-existing foot infection. (Green, Hamilton, Orji, and McKinney

Statement of Undisputed Facts in Supp. of Mot. for Summ. J. [Other Defs. SUF] ¶ 9; Pl.'s App., Ex. 13, Roseann Green Dep., at 38-39.) The parties agree that NP Green examined Robinson's infected foot, prescribed him the antibiotic he had been taking for the infection prior to his arrival at CFCF, and scheduled a follow-up appointment in seven days after the completion of the antibiotics. (Green, Hamilton, Orji, and McKinney App. to Mot. for Summ. J. [Other Defs.' App.], Pl.'s Medical Encounters, at 58a.) The parties also agree that NP Green had a record indicating Robinson was a kidney transplant patient but prescribed neither Prednisone nor CellCept. (Pl.'s App., Ex. 13, Roseanne Green Dep., at 45-46.) As NP Green testified, she did not do anything to order the kidney medications because "[i]t wasn't a pressing issue at that point on his intake. . . . A lot of patients come in and they say they have things they don't have, so it's generally our practice to get medical records." (*Id.* at 46.) Whether NP Green took any steps to ensure Robinson was seen by another provider who would prescribe these medications is contested. (*See* Other Defs. SUF ¶ 10; Pl.'s Resp. to Other Defs. SUF ¶ 10; Pl.'s App., Ex. 13, Roseann Green Dep., at 47-50.) Robinson also testified that he told NP Green he took Prograf for his kidney transplant, which she denies. (Pl.'s Resp. to Other Defs. SUF ¶ 10.)

The next day, on August 30, Defendant Dr. Robin Clemons, who worked as a chronic care physician at CFCF, reviewed a medication history report that collects all the medications a person is prescribed from major pharmacies for "Michael D Robinson." (Pl.'s App., Ex. 10, Robin Clemons Dep., at 51; *id.*, Ex. 15, Intermedix Medication History.) That medication report included Prednisone, which Dr. Clemons then prescribed. (*Id.*, Ex. 15, Intermedix Medication History; Clemons Statement of Undisputed Facts in Supp. of Mot. for Partial Summ. J. [Clemons SUF] ¶ 8; Pl.'s App., Ex. 14, Aug. 30, 2015 Progress Note.) However, she did not prescribe him CellCept at that time, despite being aware that it was part of his anti-rejection regime. (Clemons SUF ¶ 9.)

In fact, Robinson has produced evidence from CFCF's medical records log that Dr. Clemons began an order for CellCept for Robinson on August 30, but never completed it. (Pl.'s App., Ex. 73, Log for 8/30/2015 Progress Note, at 8.)

Dr. Clemons gave several explanations for her failure to prescribe CellCept: she expected records regarding Robinson's kidney medications to be sent to the prison in response to his release form; Robinson was confused about his medications; and he could not remember the name of his doctor, pharmacy, or transplant center. (*Id.*, Ex. 10, Robin Clemons Dep., at 55, 67.) In her progress note from August 30, Dr. Clemons stated that "Patient has[] been unable to recall his standing medications for his medical conditions. Therefore it has been impossible to medicate him. Will call the patient down to triage to see if there is any other way to obtain this needed information." (*Id.*, Ex. 14, Aug. 30, 2015 Progress Note.) However, the parties disagree about whether Dr. Clemons called Robinson "down to triage," as she stated she would, or otherwise saw him in person on that date. (Pl.'s Resp. to Clemons SUF ¶¶ 5-7.) Nor do the parties agree on why Clemons failed to order CellCept on August 30 or what, if any, actions she took—or should have taken—to ensure he was receiving his medications after this visit.

The records that Dr. Clemons hoped would clarify Robinson's medications arrived two days later: Einstein Medical Center faxed records regarding "Michael Robinson" back to CFCF on September 1. (Blatt SUF ¶ 30.) However, the records did not contain any information about Robinson's kidney treatment; rather, they related only to his visit to the emergency department at Einstein for his foot injury on August 25, 2015. (*Id.*; Pl.'s App., Ex. 9, Einstein Faxed Records.) The parties agree that such records would generally go to Defendant Dr. Blatt, the Site Medical Director at CFCF, who would then review them and either take any needed follow-up steps or give the records to the appropriate provider. (Clemons SUF ¶ 15; Pl.'s App., Ex. 8, Eke Kalu Dep., at

47-48; *id.*, Ex. 11, Michelle DiLauro Dep., at 56.) In this particular case, though, it is not clear that Dr. Blatt ever reviewed the records. (Pl.'s Statement of Add'l Facts in Resp. to Blatt ¶ 116; Pl.'s App., Ex. 44, Bruce Blatt Dep., at 56; *id.*, Ex. 8, Eke Kalu Dep., at 52.) And while the parties agree that Dr. Clemons never actually received these records, there is a dispute about whether she was required to follow up with Dr. Blatt about them. (Clemons SUF ¶¶ 14-17; Pl.'s App., Ex. 8, Eke Kalu Dep., at 64-69.) The parties agree that there were no further releases sent or other efforts made to get the appropriate medical records from Robinson's transplant doctors.

### ii. *Medical Care Provided by Defendants following Intake*

Following Robinson's visit with Dr. Clemons on August 30, he did not see another provider about his kidney condition until September 17. Between those dates, however, he did see numerous medical providers, including Defendants Dr. Michelle DiLauro and Physician Assistant Karen McKinney, about other issues.

In her capacity as a triage physician at CFCF, Dr. DiLauro saw Robinson regarding his foot wound on September 2. (DiLauro Statement of Undisputed Facts in Supp. of Mot. for Summ. J. [DiLauro SUF] ¶¶ 10, 12, 15.) When Dr. DiLauro saw Robinson on that day, she understood that he was a kidney transplant recipient who required Prednisone and CellCept, but disputes that Robinson told her that he also took Prograf. (*Id.* ¶¶ 17-18; Pl.'s Resp. to DiLauro SUF ¶¶ 17-18.) Regardless, Dr. DiLauro did not prescribe Robinson any medications related to his kidney during his visit in triage, because she understood Dr. Clemons to be working on this issue: Dr. Clemons had seen Robinson three days prior, indicated in her note that the patient could not remember his medications, and stated that a release form had been sent. (DiLauro SUF ¶ 19.) Aside from confirming an insulin prescription for Robinson later in September, Dr. DiLauro did not see or

have any further involvement in Robinson's treatment until after he had gone into kidney rejection. (*Id.* ¶¶ 22-23, 37.)

Five days after his visit with Dr. DiLauro, Robinson again saw a medical provider for his foot wound, this time Defendant Physician Assistant McKinney. (Other Defs. SUF ¶ 12.) She did not provide any care related to his kidney condition, though the parties again dispute whether Robinson notified her that he needed Prograf but was not receiving it. (Pl.'s Resp. to Other Defs. SUF ¶ 13.)

### iii.  *Chronic Care Visit on September 17, 2015*

During his first regularly-scheduled chronic care visit on September 17, approximately three weeks after his arrest, Robinson was treated by Defendant Nurse Practitioner Charlotte Hamilton. (Other Defs. SUF ¶ 15.) After consulting with Dr. Blatt, she prescribed CellCept, though the dose given was twice what Robinson's transplant doctors prescribed him. (*Id.* ¶¶ 16-18; Blatt SUF ¶¶ 39-40.) The parties dispute how NP Hamilton and Dr. Blatt determined the dose of CellCept to prescribe, though they all agree that neither Hamilton nor Blatt spoke with—or consulted the records from—Robinson's kidney doctors. (Blatt's App., Ex. 4, Bruce Blatt Dep., at 88; *id.*, Ex. 24, Charlotte Hamilton Dep., at 67-68; Pl.'s Add'l Facts in Resp. to Blatt SUF ¶ 152; Blatt Resp. to Pl.'s Add'l Facts ¶ 152.) Although NP Hamilton's prescription for CellCept required the nurses to dispense each dose individually to the patient rather than as a full packet, the nursing staff did not follow this order. (Other Defs. SUF ¶ 17.)

NP Hamilton and Dr. Blatt also agreed that Robinson should be referred to see his kidney transplant team at Einstein. (*Id.* ¶ 16; Blatt SUF ¶ 40.) Referrals to outside providers had to be approved by Corizon's Regional Medical Director, Dr. Kalu, and NP Hamilton submitted the request to him that same day. (Blatt SUF ¶¶ 43, 45; Other Defs. SUF ¶ 18.) Although Dr. Clemons

later thought that Dr. Kalu had not approved the request by mid-October, there are records from the Corizon scheduling department, responsible for actually arranging outside appointments, showing that Dr. Kalu approved the referral request within one day. (Blatt SUF ¶ 44; Blatt's App., Ex. 6, Paden Hinds Dep., at 67; Pl.'s App., Ex. 42, Referral Log Spreadsheet.)

Despite the referral request, Robinson did not have an appointment confirmed until October 26, more than five weeks after Hamilton made the referral request and it was approved by Dr. Kalu, and the date for his appointment was November 18. (Blatt SUF ¶ 46.) Paden Hinds, a Corizon scheduler, testified that his team had difficulty scheduling the referral because they knew Plaintiff only as "Michael Daniels," his name within the correctional facility, even though the release form, records returned, and medication history report identified "Michael Robinson." (*Id.* ¶ 47; Pl.'s App., Ex. 36, Paden Hinds Dep., at 30-31.) When confronted with this kind of problem, the scheduling department's customary practice was to notify the medical team of scheduling difficulties so that the schedulers could gather more identifying information about the patient. (Blatt SUF ¶ 47; Pl.'s App., Ex. 36, Paden Hinds Dep., at 15-16, 31.) However, the parties dispute whether Dr. Blatt, Dr. Clemons, or NP Hamilton actually received notice of the scheduling problem in Robinson's case.

> iv. *Medical Care Provided by Defendants Following September Chronic Care Visit*

Between Plaintiff's first and second visits with the chronic care department, he again was treated by a variety of Corizon medical providers, including Defendants Physician Assistant Constance Orji and Dr. Bruce Blatt. On September 29, PA Orji saw Robinson for his "history and physical" examination. (Other Defs. SUF ¶¶ 19-21.) At that time, he had recently seen NP Hamilton in chronic care, been prescribed CellCept, and was awaiting a referral with his transplant team; consequently, she did not prescribe any new treatment for Robinson's kidney condition and

simply stated in her medical note that Robinson should "cont[inue] anti-rejection med[ications] as ordered." (Pl.'s App., Ex. 27, Sept. 29, 2015 History and Physical Note.) However, Robinson testified that he told PA Orji, like his other providers, that he needed Prograf but was not receiving it. (Pl.'s Resp. to Other Defs. SUF ¶¶ 20-21.)

On October 9, Dr. Blatt received a lab report regarding Robinson, which indicated that his potassium level was elevated but his GFR and creatinine levels were within the normal range. (Blatt SUF ¶ 51.) Although the latter two indicators suggested Robinson was in good kidney health, Dr. Blatt ordered repeated studies because the potassium level could be related to kidney malfunction. (*Id.*) Three days later, Dr. Blatt received the results of the repeat studies, which showed Robinson's potassium levels to be within normal range. (*Id.* ¶ 52.)

*v.*     *Chronic Care Visit on October 15, 2015*

Robinson went to his regularly-scheduled visit in chronic care, this time with Dr. Clemons, on October 15. (Clemons SUF ¶ 19.) Following the visit, Dr. Clemons sent Dr. Blatt an electronic message, notifying him that Robinson was "overdue by 3 months" for his transplant follow-up and NP Hamilton's referral to Einstein had never been approved, and asking that Dr. Blatt expedite the referral. (*Id.* ¶¶ 22-23; Blatt SUF ¶ 56.) In his response the next morning, Dr. Blatt stated that "the patient has been stable since 2011, has a stable GFR, and had an appointment with the Transplant team just a few months ago." (Blatt SUF ¶ 59.) Dr. Blatt testified that he was under the impression that the referral had been approved but was still being scheduled, and that he had medical reasons for not expediting the referral. (*Id.* ¶¶ 57-58.) Although Robinson contests that there was a medical rationale for the delay, he has not pointed to any circumstantial evidence to the contrary.

In his message back to Dr. Clemons, Dr. Blatt also instructed her to confirm that Robinson was receiving his proper transplant medications. (*Id.* ¶ 59.) The parties dispute whether she

followed these instructions. Dr. Clemons testified that, during the visit, Robinson told her that he was receiving all of his medications. (Clemons SUF ¶ 20.) Yet Robinson testified that he informed her that he still needed his Prograf prescription. (Pl.'s Resp. to Clemons SUF ¶ 20.) At a minimum, the parties agree that, despite Dr. Clemons' earlier concern that Robinson could not remember his medications or other information about his medical care, she relied on Robinson's representations regarding his medications and took no further steps to review his outside records or contact his outside providers. (Pl.'s App., Ex. 10, Robin Clemons Dep., at 97-101.)

<em>vi.     Kidney Transplant Referral Visit</em>

After nearly three months at CFCF and two months since Robinson's initial referral was approved, he attended an appointment with his kidney doctors on November 18. (Blatt SUF ¶ 66.) Robinson's kidney team diagnosed him with acute kidney failure and kidney transplant rejection and admitted him into the hospital. (*Id.*) One of Robinson's kidney doctors, Dr. Gitana Bradauskaite, testified that he told her on November 18 that "he could not remember the name of Prograf when he was admitted to jail" and that he did not receive it during his incarceration. (Pl.'s App., Ex. 71, Gitana Bradauskaite Dep., at 36.) After making efforts to reverse Robinson's kidney rejection, he had surgery in December 2015 to remove his kidney. (*Id.*, Ex. 37, Mauricio Pedrozza Dep., at 102-03, 119-20.)

## B. Procedural Background

Robinson filed this case in August 2017 against the moving Defendants, Corizon, the City of Philadelphia, CFCF Warden Gerald May, CFCF Deputy Warden Frederick Abello, CFCF Deputy Warden Cathy Talmadge, and a variety of John Doe defendants. In January 2019, the relevant parties stipulated to the dismissal with prejudice of the City of Philadelphia and the three CFCF wardens. The following claims remain in this lawsuit: (1) violation of civil rights, pursuant

to 42 U.S.C. § 1983, against all defendants; (2) negligence/medical malpractice against all defendants; and (3) corporate (direct) negligence against Corizon. Plaintiff also seeks punitive damages against all defendants.

Now before the Court are four motions for summary judgment. Drs. Blatt and Clemons move for partial summary judgment on Robinson's civil rights and punitive damages claims. The remaining medical providers move for summary judgment on all claims against them.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248.

In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reves v. Sanderson*

*Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III. DISCUSSION

### A. Section 1983 Civil Rights Claims

Robinson brings Fourteenth Amendment claims against all Defendants, claiming that they acted with deliberate indifference toward his serious medical needs while he was a pretrial detainee at CFCF. None of the moving Defendants contest that they are state actors or that Robinson's medical needs were serious, but they all contend that Robinson has failed to adduce evidence that they acted with deliberate indifference in their medical treatment. The Court agrees with respect to all moving defendants except Dr. Robin Clemons.

#### i. *Applicable Law*

The Supreme Court has held that prison officials and private contractors working under color of state law violate the Eighth Amendment when they act with deliberate indifference to a prisoner's serious medical needs by "intentionally denying or delaying access to medical care or interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Although a pretrial detainee's claims relating to medical care arise under the Due Process Clause of the Fourteenth Amendment, their rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Thus, the Third Circuit has held that pretrial detainees' claims for deliberate indifference to their medical needs should be analyzed under the same standard applied to claims brought under the Eighth Amendment by convicted prisoners. *Natale v. Camden Cnty. Corr. Fac.*, 318 F.3d 575, 582 (3d Cir. 2003).

To establish a claim under 42 U.S.C. § 1983 in this context, "a plaintiff must make (1) a subjective showing that the defendants were deliberately indifferent to [his or her] medical needs and (2) an objective showing that those needs were serious." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017). Deliberate indifference requires more than negligence; rather, a plaintiff must show that the individual was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that he actually "dr[e]w the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In other words, "subjective recklessness" is the relevant standard and deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835, 839.

Constitutional claims regarding a pretrial detainee or prisoner's medical care fall into two distinct categories: claims of inadequate medical care and claims of a denial or delay of necessary medical care. *Pearson*, 850 F.3d at 535. While both types of claims require evidence of the defendant's subjective state of mind, they differ in other respects. In addition to the scienter requirement, adequacy of care claims require an "objective inquiry" into the medical care provided. *Pearson*, 850 F.3d at 536. When a plaintiff makes such a claim, "it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017). "[M]ere disagreement as to the proper medical treatment [does not] support a claim" of deliberate indifference. *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). "[F]ederal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Palakovic*, 854 F.3d at 228. "[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate

13

a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990). Nonetheless, the Third Circuit has found deliberate indifference in inadequate care cases in which prison officials ignored "objective evidence that [a] plaintiff had serious need for medical care." *Natale*, 318 F.3d at 582.

The Third Circuit has "found deliberate indifference in a variety of contexts including where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." *Pearson*, 850 F.3d at 538.

Defendants who have some level of medical training but who are not physicians "will not be chargeable with deliberate indifference, 'absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *Id.* at 540 n.4 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).

ii. *Dr. Clemons*

Dr. Clemons argues that she is entitled to summary judgment on Robinson's constitutional claim because there is no evidence that she "intentionally refused to provide needed treatment, delayed necessary treatment for a non-medical reason, prevented plaintiff from receiving required treatment, or persisted in a particular course of treatment in the face of resultant pain and risk of permanent injury." (Clemons Mem. of Law in Supp. of Mot. for Summ. J. [Clemons Br.] at 7.) She argues that her decision to prescribe Robinson Prednisone shortly after his intake on August 30, but to wait for his records to be returned before prescribing his other medications does not support a claim for deliberate indifference. (*Id.* at 7.) She also points to her October 15 message to Dr. Blatt concerning Robinson's referral appointment as evidence of her ongoing treatment of his

serious medical needs. (*Id.* at 7-8.) Dr. Clemons insists that Robinson's claim is based on inadequate care and, because she treated Robinson's kidney condition beginning on August 30, she cannot be found deliberately indifferent as a matter of law.

Robinson responds by arguing that Dr. Clemons denied and delayed Robinson's requests for his anti-rejection medication for non-medical reasons. (Pl.'s Opp'n to Clemons Mot. for Summ. J. [Pl.'s Clemons Br.] at 10.)[1] On August 30, Dr. Clemons saw Robinson as part of his intake process and was aware at that time that he required daily medications to prevent the rejection of his kidney transplant. (*Id.* at 12.) Nonetheless, "Dr. Clemons made no effort to identify or prescribe Mr. Robinson's medications, inform other providers that there was a kidney transplant patient who was not receiving his anti-rejection medication and was in danger of losing [his] kidney or refer him to a kidney doctor for treatment recommendations." (*Id.*) Robinson argues that Dr. Clemons "forgot about him until he saw her in a scheduled chronic care visit on October 15." (*Id.*) At their next in-person encounter, Robinson argues that Dr. Clemons' failure to confirm his kidney medications, even after being instructed by Dr. Blatt to do so, is another example of her "ignor[ing] his clear medical needs." (*Id.* at 12-13.)

As an initial matter, the Court disagrees with Dr. Clemons' argument that, simply because she prescribed one of Robinson's kidney medications on August 30, his claim must necessarily be construed as one for inadequate medical care. Several Third Circuit cases have rejected that argument. In *Durmer v. O'Carroll*, the Third Circuit reversed the district court's grant of summary judgment in favor of a prison physician, finding that the physician's particular course of treatment could support a claim for deliberate indifference. 991 F.2d 64, 68-69 (3d Cir. 1993). Specifically,

---

[1] Plaintiff's briefs are all incorrectly paginated. The Court's page references all refer to the ECF-generated page number within the relevant document.

the defendant doctor referred the plaintiff, who had suffered a stroke before he was incarcerated, to a neurologist before allowing him to undergo time-sensitive physical therapy as his pre-incarceration physician had recommended. *Id.* at 68. In its analysis, the Court noted that, while the prison doctor had taken some steps to treat the plaintiff's medical condition, there was record evidence "suggesting [he] might have had a motive for deliberately avoiding physical therapy, namely, that physical therapy would have placed a considerable burden and expense on the prison" and that it was "therefore important that the trier of fact hear [the doctor's] testimony in order to assess his credibility, and that [plaintiff's] counsel be permitted to explore the doctor's motivation on cross-examination." *Id.* at 68-69.

More recently, the Third Circuit has noted the importance of analyzing claims that can be reasonably construed as delays or denials of care as such. In *Whooten v. Bussanich*, the Third Circuit affirmed the district court's grant of summary judgment for a prison physician who the prisoner alleged had unreasonably delayed his referral to a neurologist, later refused to follow that neurologist's recommended treatment plan, and improperly refused to prescribe specific medications. 248 F. App'x 324, 327 (3d Cir. 2007). However, in reaching that conclusion, the court noted that, by simply relying on the fact that the medical staff had provided the plaintiff treatment for his medical complaint since his arrival, the district court "did not adequately address [the plaintiff's] allegations concerning the denials of (or delay in) a necessary referral and denial of effective treatment, resulting in pain." *Id.* Summary judgment was appropriate only because the plaintiff had not shown record evidence to contradict the medical explanations given by the defendant doctor for his decision to delay the referral and deny the recommended treatment. *Id.* In other words, the fact that the defendant doctor had given the plaintiff some treatment did not in

itself shield him from a claim of deliberate indifference or preclude the court's inquiry into his reasons for the delay.

With these background principles in mind, the Court believes there is sufficient evidence in the record to construe Robinson's claim against Clemons as one for a delay of medical treatment without a medical basis. When Dr. Clemons saw Robinson on August 30, she understood that he was a kidney transplant patient and knew daily medication was necessary to prevent rejection. Moreover, she understood that Robinson had a regimen of medications he was prescribed, and she knew the names of at least two medications he reported he took. Indeed, there is evidence from Corizon's electronic medical records log that Dr. Clemons began a prescription for Robinson's CellCept medication on August 30, only to delete it.

Even if Dr. Clemons' decision on August 30 itself would not support a claim for constitutionally deficient medical care, there are other genuine disputes regarding her follow-up care: whether she actually called Robinson "down to triage" to try to ascertain his medicines, a step that she stated she would take in her progress note on August 30; her ongoing obligations to follow up with Dr. Blatt about Robinson's records, as Corizon Regional Medical Director Dr. Kalu testified that she should have; and her efforts to ensure another provider prescribed him the relevant medications or were at least aware that there was a kidney transplant patient whose medications could not be identified.

Robinson's claim for deliberate indifference hinges on determining why she delayed the prescription of his medications. As the Third Circuit noted in *Durmer*, exploring a defendant's motivation is best done through cross-examination and by a jury who can consider issues of credibility.

There are genuine issues as to whether Dr. Clemons delayed the prescription of Robinson's anti-rejection medications for non-medical reasons despite knowing that he required them. Dr. Clemons' motion for summary judgment on this count is denied.

        *iii.*     *Dr. Blatt*

Dr. Blatt argues that Robinson has failed to marshal evidence from which a reasonable jury could find deliberate indifference. He contends that he "never ignored any information that was provided to him relating to the plaintiff, let alone acted to prevent plaintiff from having access to care or medication for non-medical reasons" or ever "acted to delay any necessary medical treatment for a non-medical reason." (Blatt Mem. of Law in Supp. of Mot. for Summ. J. [Blatt Br.] at 12.) Dr. Blatt points the Court to five specific instances of his involvement in Robinson's care, which he argues demonstrate his "willingness and prompt efforts to facilitate Mr. Robinson's receipt of medical services and medications." (*Id.* at 12-14.) Included in this list is his consultation with NP Hamilton on September 17, during which he instructed NP Hamilton to prescribe Robinson CellCept and to refer him to his kidney transplant team, and his response to Dr. Clemons on October 16, indicating that he had reviewed Robinson's records, that Robinson appeared stable, that his referral was being scheduled, and that Dr. Clemons should confirm his medication.

Robinson characterizes his claim against Dr. Blatt as one of denial or delay for non-medical reasons. (Pl.'s Opp'n to Blatt Mot. for Summ. J. [Pl.'s Blatt Br.] at 9.) He points to several instances—many that Dr. Blatt gives as examples of his *responsiveness* to Robinson's medical needs—as evidence of Dr. Blatt's deliberate indifference. (*Id.* at 12-13.) Of particular significance to this motion are Dr. Blatt's role in the review of Robinson's Einstein Medical Center records and involvement with the referral appointment to Einstein. Robinson argues that it was Dr. Blatt's responsibility to review records received from external providers, but, in this case, "[t]here is no

indication that Dr. Blatt reviewed the records or made any effort to identify or order Mr. Robinson's necessary anti-rejection medication" despite the "grave uncertainty about Mr. Robinson's anti-rejection regimen." (*Id.* at 12.) He also claims that the Corizon scheduling department contacted Dr. Blatt to gather additional demographic information about Robinson after they ran into scheduling difficulties but Dr. Blatt did not find that information. (*Id.*) Finally, Robinson states that Dr. Blatt "refused" to expedite Robinson's referral, despite Dr. Clemons' belief—albeit, inaccurate—that the referral had not yet been approved and was not yet scheduled. (*Id.*) He implies that it was Dr. Blatt's fault that the referral "did not take place for more than another month." (*Id.* at 13.)

The Court agrees with Dr. Blatt that summary judgment is warranted on this claim. There are two points at which Robinson can arguably claim that Dr. Blatt delayed his care: when he received Robinson's records from Einstein and when he learned from Dr. Clemons that the referral was not yet scheduled. However, Robinson has failed to produce evidence critical to a deliberate indifference claim—evidence showing Dr. Blatt's subjective awareness of the risks facing Robinson at each of these stages. Robinson himself concedes that "[t]here is no indication that Dr. Blatt reviewed the records," which would have been the only way that Dr. Blatt would have learned about this patient. (*Id.* at 12.) Even assuming that Dr. Blatt reviewed the records sent by Einstein on September 1 and understood that the records for patient "Michael Robinson" pertained to the inmate "Michael Daniels," the records themselves—which related only to his emergency visit for his foot wound on August 25, 2015—would not have put Dr. Blatt on notice of the medications Robinson urgently needed or even that he was a kidney transplant recipient. Dr. Clemons also admitted that she never followed up with Dr. Blatt about the records request or made him aware that Robinson was waiting to receive his kidney medications. While his failure to review or

forward Robinson's records could be construed as an unjustifiable delay of care, Robinson has not provided any evidence from which the Court can infer that Dr. Blatt, unlike Dr. Clemons, was subjectively aware of the risks of that delay and nevertheless followed that course of action.

Robinson's argument that Dr. Blatt impermissibly delayed his referral also fails to establish a claim for deliberate indifference. Even assuming that the scheduling department notified Dr. Blatt about the scheduling difficulties and asked him to gather more information about the patient—which the parties dispute actually occurred—there is no circumstantial evidence that Dr. Blatt was delaying the referral for non-medical reasons. When NP Hamilton initially asked him about a referral on September 17, Dr. Blatt agreed. Although Dr. Blatt did not expedite the referral on October 16, as Dr. Clemons requested, his message to Dr. Clemons—as well as his deposition testimony in this case—identified medical reasons for believing that to be unnecessary and for letting the Corizon scheduling department complete the referral request in their usual manner. While that decision may have been negligent, it does not support a claim of constitutionally deficient medical care. *See Williams v. Kort*, 223 F. App'x 95, 100-01 (3d Cir. 2007) (affirming summary judgment for two doctors and finding no deliberate indifference because the record showed that eleven-month delay in plaintiff prisoner's MRI and specialist referral were due to doctor's medical belief that plaintiff was feeling well, seemed to be improving, and, thus, did not require the test and referral for that time).

When NP Hamilton alerted Dr. Blatt to Robinson's situation on September 17, he instructed her to prescribe CellCept, the medication that NP Hamilton advised that he was not receiving, and also agreed that she should request a referral. There is no evidence from which a reasonable jury could infer that Dr. Blatt knew that Robinson required additional medications but did nothing further to prescribe them. Without any evidence of Dr. Blatt's subjective awareness of

the risks Robinson faced, Robinson's claims that Dr. Blatt should have done more to confirm the appropriate dosage of CellCept and find out his other medications sound in negligence. Dr. Blatt's motion for summary judgment on this claim is granted.

        *iv.*     *Dr. DiLauro*

There is no dispute that Dr. DiLauro only cared for Robinson twice before he went into kidney rejection. First, she saw him on September 2 as a triage physician, treating his foot wound. During that visit, she understood that Robinson was a kidney transplant recipient, but she read in his medical record that Dr. Clemons had seen him three days earlier and prescribed him an anti-rejection medication. The medical note also indicated a release form had been sent four days earlier. Based on this information, she inferred that Robinson was being treated for his kidney needs. Second, Dr. DiLauro completed an order for Robinson's insulin on September 22. Taken together, DiLauro contends that this factual record cannot support a finding a deliberate indifference. (DiLauro Mem. of Law in Supp. of Mot. for Summ. J. [DiLauro Br.] at 9-10.)

The only factual dispute between Robinson and Dr. DiLauro is whether he informed her of his need for Prograf. (Pl.'s Opp'n to DiLauro Mot. for Summ. J. [Pl.'s DiLauro Br.] at 9-12.) Even assuming that he did, Robinson has not pointed the Court to any record evidence that calls into question her reasoned explanations for not prescribing any kidney medications to him when she treated his foot wound. The Court finds that no reasonable jury could infer from the record evidence that Dr. DiLauro exhibited deliberate indifference toward Robinson. Her motion for summary judgment on this claim is granted.

        *v.*     *NP Green, NP Hamilton, PA Orji, and PA McKinney*

The non-physician medical providers, NP Roseann Green, NP Charlotte Hamilton, PA Constance Orji, and PA Karen McKinney, all move for summary judgment. Based on the Third

Circuit's recent pronouncement that non-physician medical providers "will not be chargeable with deliberate indifference, 'absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner,'" the Court grants these defendants' motion for summary judgment. *Pearson*, 850 F.3d at 540 n.4 (quoting *Spruill*, 372 F.3d at 236). As these defendants point out, Robinson was already being treated by physicians, or was at least scheduled to see one, at each time that these non-physician providers treated him. (Green, Hamilton, Orji, and McKinney Mem. of Law in Supp. of Mot. for Summ. J. [Other Defs. Br.] at 18.) He has not pointed to any evidence showing that these Defendants had reason to believe or knew that these doctors were mistreating him. Accordingly, these Defendants are entitled to summary judgment.

### B. Negligence Claims

Robinson asserts claims for negligence and medical malpractice against all Defendants. However, only Dr. DiLauro, NP Green, NP Hamilton, PA Orji, and PA McKinney move for summary judgment on this claim. Because there are genuine issues of material facts about the negligence claims brought against NP Hamilton, the Court denies her motion. However, Robinson has failed to provide evidence from which a reasonable jury could find that Dr. DiLauro, NP Green, PA Orji, or PA McKinney were negligent here.

### i. *Applicable Law*

Pennsylvania law requires that a plaintiff prove four elements to establish a prima facie case of medical malpractice: (1) a duty owed by the physician to the patient; (2) a breach of that duty by the physician; (3) that the breach was the proximate cause of the harm suffered; and (4) the damages suffered were a direct result of harm. *Quinby v. Plumsteadville Family Practice*, 907 A.2d 1061, 1070-71 (Pa. 2006). "With all but the most self-evident medical malpractice actions

there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation." *Id.* In medical malpractice actions, "expert testimony [must] establish to a reasonable degree of medical certainty that the defendant's acts deviated from an acceptable medical standard, and that such deviation was the proximate cause of the harm suffered." *Welsh v. Bulger*, 698 A.2d 581, 585 (Pa. 1997). However, there are no magic words that an expert must use; it is "the substance of their testimony [that] must be examined to determine whether the expert has met the requisite standard." *Stimmler v. Chestnut Hill Hosp.*, 981 A.2d 145, 155 (Pa. 2009).

"[I]n establishing a *prima facie* case, the plaintiff [in a medical malpractice case] need not exclude every possible explanation of the accident; it is enough that reasonable minds are able to conclude that the preponderance of the evidence shows the defendant's conduct to have been a substantial cause of the harm to [the] plaintiff." *Mitzelfelt v. Kamrin*, 584 A.2d 888, 892 (Pa. 1990). However, the Pennsylvania Supreme Court has specifically held that the causation element generally requires expert testimony. "[I]n a medical malpractice action . . . plaintiff must present medical expert testimony to establish that the care and treatment of the plaintiff by the defendant fell short of the required standard of care and that the breach proximately caused the plaintiff's injury. Hence, causation is also a matter generally requiring expert testimony." *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003).

   *ii. NP Hamilton*

NP Hamilton argues that she is entitled to summary judgment on Robinson's medical malpractice/negligence claim because Robinson's experts have failed to articulate precisely what standard of care applied to her as a nurse practitioner working alongside a physician, how she breached that standard, and how that breach caused harm to Robinson. (Other Defs. Br. at 18-20.)

In response, Robinson identifies all of the information pertaining to NP Hamilton within two expert reports he has produced in this case, one from Dr. Tawana Smith, an internal medicine physician with "substantial prison health experience," and one from Dr. Matthew Cooper, a transplant surgeon. (Pl.'s Opp'n to Green, Hamilton, Orji, and McKinney Mot. for Summ. J. [Pl.'s Other Defs. Br.] at 14-17.)

In his report, Dr. Cooper criticizes NP Hamilton for "indiscriminately prescrib[ing] the incorrect dosage of Mr. Robinson's CellCept without correspondence from Einstein, corroboration with the patient's current transplant treating team and in the absence of formal transplant training." (*Id.* at 16; Pl.'s App., Ex. 48, Matthew Cooper Report, at 4.) Dr. Cooper notes in his report the known problems with prescribing only CellCept and "low dose Prednisone" as an anti-rejection regimen and then states that "[f]ailure to neither recognize this nor seek the counsel of a trained transplant physician or post-transplant care provider is reckless and irreconcilable. To further prescribe undocumented doses of CellCept and Prednisone without a monitoring strategy or a concerted effort to monitor for side-effects of these medications is improper." (Pl.'s Other Defs. Br. at 16; Pl.'s App., Ex. 48, Matthew Cooper Report, at 4.) He goes on to explain that "[t]he consequences of both omission of a critical immunosuppressive medication in the regimen of a transplant patient and the inappropriate dosing of additional [immunosuppressive] medications can and did have deleterious results." (Pl.'s Other Defs. Br. at 16; Pl.'s App., Ex. 48, Matthew Cooper Report, at 4.) He concludes his report by indicating that these improper decisions contributed to the loss of Robinson's kidney and "will have reduced life expectancy." (Pl.'s Other Defs. Br. at 17; Pl.'s App., Ex. 48, Matthew Cooper Report, at 6.)

Given that there are, at a minimum, disputes about how NP Hamilton decided to prescribe Robinson his CellCept and Robinson has provided expert evidence that this medication decision

impacted his ultimate kidney rejection, the Court finds that there are genuine issues of material fact that preclude summary judgment on this claim.

### iii.  *Dr. DiLauro, NP Green, PA McKinney, and PA Orji*

Both Dr. DiLauro and the remaining non-physician Defendants make similar arguments to NP Hamilton in support of their motions for summary judgment on Robinson's medical malpractice/negligence claim. (DiLauro Br. at 12-14; Other Defs. Br. at 19-20.) However, the Court agrees with these defendants that Robinson has failed to adduce evidence to survive summary judgment.

NP Green saw Robinson after his medical intake on August 29. At that time, NP Green prescribed a follow-up appointment for Robinson's foot wound and prescribed him antibiotics for that. However, she did not prescribe Robinson either of the anti-rejection medications Robinson reported that he took, CellCept and Prednisone. Although the parties dispute whether NP Green took any steps to ensure that Robinson actually had a follow-up appointment scheduled with a provider who would prescribe those medications, it is uncontested that he was, in fact, seen the next day by Dr. Clemons. Plaintiff's experts have not pointed to any other way in which NP Green's failure to ensure follow-up care actually caused or substantially contributed to his ultimate kidney rejection. Thus, the Court finds that NP Green is entitled to summary judgment on the negligence claim against her.

Each of the other providers, Dr. DiLauro, PA McKinney, and PA Orji, saw Robinson one time between September 2 and November 18 before his diagnosis of acute kidney failure and rejection. Each of these visits pertained to something other than his kidney care. Even assuming that Robinson told each of these providers that he required Prograf and was not receiving it, Robinson has not provided expert testimony describing how these providers' failure to follow up

about his kidney medication breached a specific standard of care or caused his ultimate kidney rejection. Dr. Cooper's report does not discuss any of these providers. Aside from a summary of the facts, Dr. Smith spends one paragraph describing the negligence of Dr. DiLauro, PA McKinney, and PA Orji. After stating the dates on which Dr. DiLauro and PA McKinney saw Robinson, she states that "[a]ll of their notes indicate that Mr. Robinson required CellCept for his kidney, but neither of these providers checked to see if he was receiving his kidney medications." (Pl.'s App., Ex. 46, Tawana Smith Report, at 10.) She then states PA Orji "also failed to take any action to confirm he was receiving his medications" and that "Mr. Robinson testified that he told all of the providers he encountered that he was not getting his medications." (*Id.*) The paragraph concludes, without any further contextual analysis or evaluation of their roles as non-chronic care medical providers, that they "were deliberately indifferent and deviated from the standard of care in their treatment of this patient." (*Id.*) This kind of conclusory statement from an expert, without more, is insufficient to withstand summary judgment.

### C. Punitive Damages

All moving Defendants seek summary judgment on the issue of punitive damages. In federal civil rights claims brought pursuant to 42 U.S.C. § 1983, "a jury may be permitted to assess punitive damages . . . when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). For negligence claims under Pennsylvania law, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct. . . . [W]hen assessing the

propriety of the imposition of punitive damages, the state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless, or malicious." *Hutchinson v. Luddy*, 870 A.2d 766, 770 (Pa. 2005). Only where a plaintiff proves at trial that the defendant acted with "greater culpability than ordinary negligence" are punitive damages appropriate. *Brand Mktg. Grp., LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347, 358 (3d Cir. 2015) (applying Pennsylvania law on punitive damages).

Because all moving Defendants except Dr. Clemons are entitled to judgment as a matter of law on the deliberate indifference claim and there are no genuine facts from which a reasonable jury could find that these defendants acted "outrageously" such that punitive damages is appropriate under Pennsylvania law, summary judgment is also warranted for these Defendants on the subject of punitive damages. However, Robinson may proceed with his claim for punitive damages under both the constitutional and negligence claims that remain against Dr. Clemons. Because Robinson has produced evidence from which a reasonable jury could find that Dr. Clemons acted with deliberate indifference, it is logical that a jury would be able to assess the claim for punitive damages as well.

## IV.    CONCLUSION

For the reasons discussed above, the motions for summary judgment are granted in part and denied in part. Dr. Robin Clemons' motion for partial summary is denied; there are genuine issues of material fact with respect to all of Robinson's claims against Dr. Clemons. Dr. Bruce Blatt's motion for partial summary judgment is granted; the only remaining claim against Dr. Blatt is negligence/medical malpractice. NP Charlotte Hamilton's motion for summary judgment is granted in part and denied in part; Robinson has demonstrated genuine issues of material fact with regard to the negligence/medical malpractice claim against NP Hamilton. Dr. Michelle DiLauro,

NP Roseann Green, PA Constance Orji, and PA Karen McKinney are entitled to summary judgment on all claims against them. An Order consistent with this Memorandum will be docketed separately.